Filed 9/29/23  In re K.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>R.C. et al,<br><br>    Defendants and Appellants. | E080784<br><br>(Super.Ct.No. J281784)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant, R.C.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant, D.P.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

This is an appeal taken by a mother and father from the order of the San Bernardino County Juvenile Court terminating their parental rights pursuant to Welfare and Institutions Code section 366.26 as to their child, K.P.[1]  The sole issue is whether the juvenile court erred when found the beneficial parent-child relationship exception to termination of parental rights did not apply.  We will affirm.

## BACKGROUND

In July 2019, the San Bernardino County Children and Family Service (the Department) took then three-year-old K.P. into protective custody after a Chino police officer reported she was living with her parents in a warehouse that had been red tagged as uninhabitable.  Old furniture, broken down vehicles, clothing, machinery, and trash were strewn throughout the warehouse.  The police officer found a broken meth pipe and a small trailer filled with blankets, toys, and old food inside the building.  K.P.'s clothing was dirty, her hair was dirty and matted, and she had marks from bug bites all over her legs, arms, and face.  The Department filed a juvenile dependency petition alleging the child came within subdivision (b)(1) of section 300.

The juvenile court sustained the petition, adjudged K.P. a dependent of the court, detained her from her parents, and ordered the Department to provide family

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

reunification services. Visits between the parents and the child were to take place a minimum of once a week for two hours.

Reunification efforts were not successful and, at the contested 18-month review hearing in February 2021, the court terminated them. It set K.P.'s case for a permanent plan review hearing pending approval of an out-of-state relative adoptive placement. In October 2022, the Department reported that K.P. had been placed in the approved relative home of the S. family, and recommended a section 366.26 permanent plan selection hearing be set so adoption by the relatives could take place.

The section 366.26 hearing was combined with a hearing on mother's section 388 petition seeking unsupervised visits with K.P. and her placement in a transitional home on the grounds K.P. wanted to reunify with her. Neither parent was present at the hearing. The court denied mother's petition and went on to find K.P. was likely to be adopted, she did not have a substantial positive, emotional attachment to her parents such that she would benefit from continuing her relationship with them, and there was no evidence of detriment that outweighed the benefit of a stable adoptive home. It ordered termination of parental rights. Each of the parents filed a timely notice of this appeal.

**DISCUSSION**

On appeal, mother (joined by father) argues the juvenile court erred when it found the evidence insufficient to support the application of the beneficial parent-child exception to termination of parental rights. We disagree.

3

In cases like the present one in which family reunification efforts have failed and the court has found the child is likely to be adopted, the juvenile court is required to terminate parental rights unless the child comes within the exceptions to termination set forth in subdivision (c) of section 366.26.  (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).)  One of those exceptions permits the selection of a permanent plan other than adoption if the parent has established three elements by a preponderance of evidence:  (i) the parent maintained regular visitation and contact with the child, (ii) the child has, and would benefit from continuing, a substantial, positive, emotional attachment to the parent, and (iii) termination of that relationship would be detrimental to the child even when balanced against the benefits of an adoptive home.  (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

The first two elements are generally reviewed for substantial evidence and the third is reviewed for abuse of discretion.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)  If the issue is one of a failure of proof, however, then the appropriate standard of review is not whether substantial evidence supports the juvenile court's finding, but rather whether as a matter of law the evidence compels a finding in favor of the parent.  (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  Whether the child has a relationship with the parent sufficient to come within the exception is determined by taking into consideration the child's age, the portion of the child's life spent in the parent's custody, the effect on the child of

4

interaction with the parent, and the child's particular needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In this case, the parties do not dispute, and the record supports, the juvenile court's finding that the parents had maintained regular visits and contacts with K.P. over the course of the dependency proceedings. What is lacking, however, is evidence compelling a finding that K.P. has such a substantial, positive, emotional attachment to her parents such that the benefit of continuing those relationships—and the detriment of severing it—would outweigh the benefit to the child of adoption by the S. family.

The parents make two claims in support of their argument that the court should have applied the beneficial parent-child relationship.

One claim is the juvenile court could not decide the exception's applicability without first making a determination of her wishes and best interests pursuant to subdivision (h)(1) of section 366.26. They posit the court necessarily could not make that finding because it was "improper" for the social worker to tell K.P. postadoption visits with her parents were possible instead of explaining to the child that adoption would terminate all relationships with her parents, including visitation. The other claim, which is not separately stated but included in the discussion of their first one,[2] is the beneficial relationship exception to termination of parental rights should have been applied because

---

[2] Rule 8.204(a)(1)(B) of the California Rules of Court requires each point in a brief to be stated under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

there was a "general consensus" that K.P. would be traumatized if the relationship with her parents was severed. The claims are without merit.

We note first that there is nothing improper about the social worker telling K.P. that visits with her biological parents were possible after adoption. Family Code section 8616.5 authorizes adoptive parents to enter voluntarily into an agreement to permit the birth parents to visit a child who was adjudged a dependent of the court so long as the child is represented by counsel for the purposes of the agreement. (Fam. Code, § 8616.5, subds. (a) & (d).) K.P.'s adoptive parents were open to entering into such an agreement if appropriate.

Contrary to the parents' argument, the notion that the child might benefit from continued contact with her biological parents does not signal that it would be detrimental to her to be adopted. It is clear from the plain language of Family Code section 8616.5 that the Legislature authorized postadoption voluntary contract agreements in recognition that some children may benefit from contact with the birth parents after parental rights are terminated. (Fam. Code, § 8616.5, subd. (a).) There is nothing in the statute to suggest it is intended to undermine that statutory preference for termination of parental rights to free a child for adoption set forth in subdivision (b) of section 366.26.

Subdivision (h)(1) of section 366.26 requires the juvenile court to consider the wishes of the child and to act in the best interests of the child in all permanent plan selection proceedings conducted pursuant to the section. Here, the record clearly establishes the juvenile court's compliance with that provision. When making its order

6

terminating parental rights, the court acknowledged K.P. "may have some residual sadness if visits are terminated." It then balanced the possibility of that sadness against the possibility of K.P. spending 11-plus years in a home where she is happy, bonded, and wished to be adopted, and found the stability of adoption "clearly" outweighed any detriment related to termination of possible parental visits.

The court's conclusion is amply supported by the record. Although K.P. would ask for her parents and cry following visits taking place early in the dependency proceedings, the record establishes her emotional attachment to them waned during the three years and six months she had been out of their home.

By the time of the six-month review hearing, the Department reported no concerns with the child's visits with her parents and made no mention in the six-month status report or in any reports thereafter of K.P. asking about them or crying when visits were over.

In October 2022, the Department reported K.P. had been placed with the S. family in Nevada two months earlier, and the family wanted to adopt her. She was bonding well with all members of the family. She wanted to be adopted by them and expressed fear that people were going to come and take her away. K.P. needed constant assurance that she would return to the S. home after visits and that she was going to be adopted by them. During in-person visits with her parents, she chose to stay close to her prior foster parent and Mr. and Mrs. S.

7

After being placed for adoption, K.P. would not engage with her parents during two video phone calls and did not want to talk with them. On her seventh birthday (in October 2022), K.P. did not want to sit with her parents, who became upset when the child preferred to play rather than visit with them. K.P. also told her parents and several others that her last name was going to change, and she seemed excited about it.

In November 2022, K.P. reported mother told her during a visit that she would never see her parents ever again if she is adopted, and told her to tell the social worker she did not want to be adopted. The worker explained to K.P. that contact with her biological parents would still be possible after adoption, and told her Mr. and Mrs. S. (already referred to by K.P. as mom and dad), wanted to take care of her and have her live with them and make important decisions for her until she was a grownup. The S. family was open to K.P. having ongoing contact with the biological parents if they were appropriate. Although K.P. loved her parents, she had developed strong bonds with her new family, she was comfortable and content, and she continued to be excited about being adopted.

At the permanent plan selection hearing, K.P.'s counsel represented her client is eager to be adopted by the S. family and, when interviewed in counsel's office, K.P.'s statements reflected those attributed to the child in the Department's report.

## CONCLUSION

In view of the foregoing, we do not find the record compels a finding that the parents met their burden of establishing that K.P. had such a substantial, positive

8

emotional attachment to them that it would be beneficial to her for those relationships to continue.  Accordingly, the juvenile court did not abuse its discretion in finding the benefit to K.P. of adoption outweighed any potential detriment to her of severing her relationship with her parents.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

9